## MUNICIPIO DE QUEBRADILLAS, PETICIONARIO, *v.* SECRETARIO EJECUTIVO, DEMANDADO.

## SOLICITUD para que se expida un auto de *mandamus* contra el Secretario Ejecutivo de Puerto Rico.

### No. 170.—Resuelto en marzo 11, 1919.

MANDAMUS—JURISDICCIÓN ORIGINAL DEL TRIBUNAL SUPREMO PARA EXPEDIR EL AUTO.—El Tribunal Supremo de Puerto Rico tiene jurisdicción original para expedir autos de *mandamus* de acuerdo con la ley de 1903 de la Legislatura Insular, a pesar de que el artículo 48 de la Ley Orgánica de esta Isla, de marzo 2, 1917, conocida por Ley Jones, sólo menciona a las cortes de distrito como facultadas para conceder esos autos.

MANDAMUS—LEGALIDAD DE LAS SESIONES DE LA LEGISLATURA.—La jurisdicción del Tribunal Supremo no puede ser requerida con el simple objeto de determinar la legalidad de las sesiones de la legislatura, pero sí puede serlo para determinar tal legalidad cuando median intereses privados, como sucede en este caso.

MANDAMUS—RAZONES PARA QUE EL TRIBUNAL SUPREMO EXPIDA EL AUTO.—La circunstancia de que en una solicitud de *mandamus* no se consignen las razones para que esta Corte Suprema expida originalmente el auto, según requiere la regla 69 de este Tribunal, no impide el ejercicio de nuestra jurisdicción cuando, como en este caso, de la solicitud aparece que el auto se solicita contra un alto funcionario público y envuelve la resolución de cuestión tan importante como la legalidad de la continuación de las sesiones de la Asamblea Legislativa por un largo período de tiempo.

ID.—PROMULGACIÓN DE LAS LEYES DE LA LEGISLATURA—SECRETARIO EJECUTIVO.— Puesto que el artículo 22 de la Ley Orgánica de Puerto Rico impone al Secretario Ejecutivo la obligación de registrar, conservar y promulgar las leyes decretadas por la Asamblea Legislativa, es obvio que cualquiera persona beneficiada por una ley tiene derecho a que esté archivada y promulgada como las demás leyes y puede dirigir el procedimiento de *mandamus* contra el Secretario Ejecutivo de Puerto Rico.

SESIONES LEGISLATIVAS—DURACIÓN DE LAS SESIONES ORDINARIAS Y DE LAS EXTRAORDINARIAS.—De los artículos 31 y 33 de la Ley Orgánica de Puerto Rico, es claro que hay dos clases de sesiones que puede celebrar la Asamblea Legislativa: una ordinaria, que comienza en un día fijado por la ley; la otra extraordinaria, que se celebra por convocatoria del Gobernador; debiendo necesariamente terminar la segunda dentro de diez días no incluyendo domingos y días festivos, mientras que a la ordinaria no se le fijó tiempo de duración, quedando al criterio de la Asamblea Legislativa la fecha de terminarla. Al declarar la ley lo que habrán de cobrar los Senadores y Representantes durante los primeros noventa días de sesión ordinaria, y lo que habrán de cobrar durante los siguientes días, expresó claramente la intención del legislador de que la legislatura puede estar reunida en sesión ordinaria por más de noventa días; siendo la reducción en la dieta una mera restricción para apremiar a los legisladores en sus trabajos, que no puede tener el alcance de limitar a sólo noventa días la sesión regular.

Sesiones Legislativas—Facultad del Gobernador para Hacer Nombramien-
tos.—Si bien es cierto que el Gobernador tiene facultad para convocar a
la Asamblea Legislativa a sesión extraordinaria cuantas veces lo crea con-
veniente en interés público, y que mientras la Asamblea Legislativa está
en sesión regular no puede ser convocada a sesión extraordinaria, a pesar
de esto no estamos autorizados para poner limitación arbitraria al tiempo
durante el cual la legislatura puede estar reunida en sesión regular, pues
a pesar de que el legislador debió tener esto en cuenta, el Congreso no quiso
fijar límites rígidos al tiempo de la reunión y por tanto nosotros no podemos
reducirlo ni concretarlo a noventa días.

No es argumento tampoco en contra de la duración de las sesiones
por más de noventa días el que se priva al Gobernador de su facultad de
hacer nombramientos mientras la legislatura está cerrada porque da por
sentada la cuestión en controversia y no puede prevalecer pues él puede
hacer nombramientos aunque sujetos a la aprobación del Senado y tendrá
que enviárselos, mientras que si no está reunida la legislatura el nombramiento
surtirá efecto desde luego hasta que se reuna la Asamblea Legislativa, o el
Senado sea convocado a sesión. Igual argumento es aplicable al término
de treinta días que tiene el Gobernador para aprobar un proyecto de ley
cuando la legislatura ha clausurado sus sesiones antes de transcurrir los
diez días que para aprobarlo tiene cuando aquélla está en sesión.

Mandamus—Suspensión de las Sesiones Legislativas—Devolución por el Go-
bernador de Proyectos de Ley sin Aprobación.—Es claro que pudiendo la
Asamblea Legislativa suspender su sesión en cualquier tiempo por más de
tres días para reanudarla en otro fijado por ella, esa suspensión no pone
término definitivo a la sesión regular ni es la clausura de la legislatura,
puesto que transcurridos los días de suspensión puede legalmente reunirse
otra vez para continuar la misma sesión regular, no impidiendo por tanto
la devolución por el Gobernador de los proyectos de ley que no apruebe,
pues tal impedimento sólo tiene lugar cuando la sesión ha sido suspendida
finalmente. De la ley resulta que hay tres clases de suspensiones: una que
puede cualquier Cámara tomar por sí misma, no excediendo de tres días;
otra temporal que puede exceder de ese término, tomada por acuerdo mutuo
de ambas Cámaras, para reunirse en día fijo; y otra final, para no reunirse
otra vez, que es la suspensión *sine die*. La primera y la segunda no impiden
la reconsideración de los proyectos de ley que el Gobernador no aprueba;
la tercera sí, y es la única a que se refiere el artículo 34.

Devolución por el Gobernador de los Proyectos de Ley que no Aprueba,
Cuando la Asamblea Legislativa Está en Receso—Artículo 39 del Có-
digo Político.—La antigua Ley Orgánica contenía igual precepto que la
vigente, en cuanto al deber del Gobernador de devolver a la Cámara de
origen dentro de diez días los proyectos de ley que no aprobase, y en 1902
la Asamblea Legislativa de Puerto Rico decretó en el artículo 39 del Código
Político que si el día en que el Gobernador deseare devolver un proyecto de
ley sin su aprobación se hallare en receso la Cámara de origen, podrá en-
tregarlo junto con su mensaje al Presidente o Secretario de dicha Cámara,
y que si después de buscarse con la debida diligencia no pudiere darse con
ninguno de éstos, entonces hará la entrega a cualquier miembro de ella, la
cual tendrá el mismo efecto de una devolución en sesión abierta, siempre
que por medio de mensaje notificare tal entrega, el primer día de reanu-

dada dicha sesión. Ese precepto del Código Político está en vigor de acuerdo con el artículo 57 de la Ley Jones, pues no es contrario a ninguna de sus disposiciones.

Los hechos están expresados en la opinión.

Abogado del peticionario: *Sr. Miguel Guerra.*

Abogado del demandado: *Hon. Howard L. Kern, Attorney General.*

EL JUEZ ASOCIADO SR. ALDREY emitió la opinión del tribunal.

La primera y más importante de las cuestiones previas alegadas por el Secretario Ejecutivo de. Puerto Rico, don Ramón Siaca Pacheco, al comparecer ante nosotros en virtud del auto condicional de *mandamus* que contra él expedimos en este caso es la referente a la jurisdicción de este Tribunal Supremo para conceder autos de *mandamus,* pues sostiene que si bien teníamos esa jurisdicción por la ley de la Legislatura Insular del año 1903, carecemos ahora de ella desde que en 2 de marzo de 1917 fué aprobada por el Presidente de los Estados Unidos la ley de aquel Congreso para proveer de un gobierno civil a esta isla, y para otros fines, generalmente conocida por la Ley Jones, puesto que disponiendo el artículo 40 que la jurisdicción que tenían los tribunales continuará como al presente hasta que otra cosa se disponga por la ley, y habiendo la nueva ley concedido en su artículo 48 solamente a las cortes de distrito jurisdicción para expedir autos de *mandamus,* tal jurisdicción es exclusiva en dichas cortes, ha dejado de estar en vigor la ley de 1903, y llega hasta sostener que ni siquiera la Legislatura puede concedernos jurisdicción original para expedir autos de *mandamus,* a menos que sea para hacer efectiva nuestra jurisdicción de apelación.

Dejaremos a un lado la última cuestión propuesta toda vez que no es materia que tengamos que resolver ahora porque no existe ley alguna de la Legislatura Insular posterior a la Ley Jones que nos conceda esa jurisdicción, y nos limitaremos a resolver si la ley de 1903 que nos concedió juris-

dicción original para librar autos de *mandamus* ha quedado sin vigor como consecuencia de los artículos citados de la nueva Ley Orgánica de Puerto Rico y, por tanto, si por esta razón carecemos de jurisdicción original para expedir autos de *mandamus* en casos en que, como el presente, no se trata de hacer efectiva nuestra jurisdicción de apelación ni de hacer efectivo nuestro poder para compeler a los tribunales inferiores al cumplimiento de los deberes que les imponen las leyes.

Si bien es cierto que el artículo 48 al conferir jurisdicción a las cortes de distrito para conceder autos de *mandamus* guardó silencio en este particular con respecto a la Corte Suprema, no entendemos que tal cláusula derogue en modo alguno la ley de 1903 de la Legislatura Insular que nos concedió tal jurisdicción, en vista de que el artículo 40 decreta que los tribunales continuarán con la jurisdicción que hasta entonces tenían hasta que otra cosa se dispusiese por la ley. Si no hubiese consignado esta disposición el artículo 40, entonces indudablemente hubiera terminado nuestra jurisdicción original para expedir autos de *mandamus,* desde el momento en que empezó a regir la nueva Ley Orgánica, como consecuencia de la jurisdicción concedida a las cortes de distrito en su artículo 48.

Nos confirma en este parecer el artículo 57 al disponer que las leyes entonces en vigor continuarán vigentes excepto en aquellos particulares en que sean alteradas, enmendadas o modificadas por dicha Ley Orgánica, por la autoridad legislativa de Puerto Rico o por el Congreso de los Estados Unidos, toda vez que al conceder el artículo 48 jurisdicción original a las cortes de distrito en procedimientos de *mandamus* no hizo otra cosa que confirmarles la jurisdicción que ya les había otorgado la Legislatura Insular en el año 1903 y en modo alguno puede interpretarse dicho precepto como derogatorio de dicha ley pues no la enmendó, alteró ni modificó.

Antes de que podamos considerar la alegación del deman-

dado de que en el caso concreto que tenemos ante nosotros carecemos de jurisdicción original para expedir autos de *mandamus* es necesario que expongamos los hechos alegados en la petición, aunque sea sólo en lo sustancial.

El Municipio de Quebradillas solicitó la expedición del auto de *mandamus* contra el Secretario Ejecutivo de Puerto Rico, alegando que está organizado de acuerdo con la Ley Municipal de 1906; que en 13 de agosto de 1917 la Asamblea Legislativa de Puerto Rico abrió su primera sesión ordinaria de acuerdo con la actual Ley Orgánica de esta isla; que el día 12 de septiembre de 1917 estando en sesión la Asamblea Legislativa se presentó un proyecto de ley, que transcribe, según el cual El Pueblo de Puerto Rico debía hacerse cargo, desde que fuera aprobado, de un pozo artesiano que surte de agua al pueblo de Quebradillas; que dicho proyecto fué aprobado en votación por lista por la Cámara de Representantes y por el Senado por una mayoría de sus miembros y firmado por sus respectivos presidentes el 25 de noviembre de 1917; que el Gobernador de esta isla lo recibió el mismo día 25 de noviembre de 1917 para su consideración y estudio; que al siguiente día 26 la Cámara y el Senado, por mutuo y expreso consentimiento que se prestaron, suspendieron sus sesiones hasta el día 4 de febrero de 1918; que el Gobernador de Puerto Rico no devolvió dicho proyecto dentro de los diez días siguientes, con excepción de los domingos, de haberlo recibido; que la Asamblea Legislativa no levantó su sesión durante ese período de diez días sino el 6 de febrero de 1918; que dicho proyecto se ha convertido en ley por no haberlo devuelto el Gobernador ni aprobado ni vetado dentro de los diez días de haberlo recibido, no habiendo levantado sus sesiones la Asamblea Legislativa durante ese período; que a pesar de que de acuerdo con el artículo 22 de la vigente Ley Orgánica de esta isla el Secretario Ejecutivo tiene el deber de promulgar todas las leyes decretadas por la Legislatura Insular, se ha negado a promulgar dicha ley a pesar

de haber sido requerido para hacerlo, contestando que no fué aprobada por el Gobernador y que cumpliendo sus órdenes no la publicó ni la publicará, a menos que los tribunales de justicia decidieren que está en vigor, por estimar que la Asamblea Legislativa no terminó sus. sesiones ordinarias el 26 de noviembre de 1917 sino que simplemente tomó un receso hasta el primer lunes de febrero; alegó también que la suspensión de las sesiones de la Asamblea Legislativa fué un acto legal y autorizado por la ley y que no tiene otro recurso adecuado, rápido y eficaz en el curso ordinario de la ley, como el que utiliza, por lo cual concluyó pidiendo que ordenásemos al Secretario Ejecutivo de Puerto Rico. que promulgue y publique oficialmente dicha ley.

En vista de estas alegaciones sostiene el demandado que no tenemos jurisdicción para expedir el auto de *mandamus* en este caso porque tendría el efecto de determinar la legalidad de las sesiones de la Legislatura. Como única argumentación en apoyo de esta alegación, cita .algunos párrafos del caso de *Clough* v. *Curtis,* 134 U. S. 381.

Hemos estudiado el caso que se cita y encontramos que no sostiene la alegación hecha por el demandado. Según la opinión del tribunal escrita por el Juez Sr. Harlan, el Presidente de la Cámara de Representantes y del Consejo, cuyos cuerpos constituían la Asamblea Legislativa de Idaho en el año 1899, presentaron cada uno separadamente una petición a la Corte Suprema de aquel territorio en las que alegando que la Asamblea Legislativa había levantado su sesión *sine die* el 7 de febrero de ese año por haber terminado a las doce de la noche los sesenta días de ella, después de esa hora algunos de los miembros de esos cuerpos nombraron un presidente *pro tempore* y aprobaron varias leyes, y alegando, además, que los secretarios de dichos cuerpos no habían comunicado al Secretario Ejecutivo la verdad de lo ocurrido en esas sesiones pidieron que se ordenara al Secretario Ejecutivo que corrigiese los procedimientos para que resultase

la verdad de lo ocurrido y pudiera ser certificada al Congreso de los Estados Unidos. La Corte Suprema de Idaho negó la expedición de los autos y cuando el Tribunal Supremo de los Estados Unidos resolvió conjuntamente los recursos de apelación establecidos por dichos presidentes confirmó los fallos apelados, entre otras razones, porque en casos en que no mediaban intereses privados la jurisdicción de la corte no podía ser requerida para resolver si determinados cuerpos legislativos que asumían ejercer funciones legislativas constituían legalmente una Asamblea Legislativa, cuestión que podría suscitarse en pleito que tuviera por base alguna ley decretada por dicha asamblea.

El caso que ahora estamos considerando para resolver se encuentra dentro de lo previsto por la Corte Suprema de los Estados Unidos en esa sentencia pues el peticionario reclama el derecho que le concede una ley respecto a que el pozo artesiano de Quebradillas sea sostenido por El Pueblo de Puerto Rico, reclamación que puede hacer el municipio peticionario porque si dicho proyecto de ley ha llegado a ser ley resultará beneficiado por ella porque no tendrá que conservarlo y mantenerlo, lo cual necesariamente origina gastos. Cuando se practicó la prueba en el juicio se demostró que efectivamente el sostenimiento del pozo cuesta a dicho municipio una cantidad de dinero anual.

En cuanto al otro argumento del demandado de que carecemos de jurisdicción porque de acuerdo con la Regla 69 de las de esta Corte Suprema en la solicitud deben consignarse las razones que hacen indispensable que originalmente expidamos el auto, siendo nuestra jurisprudencia en ese sentido, diremos que la falta de esas razones no nos priva de jurisdicción y que si las exigimos es para no intervenir originalmente en casos sin importancia; pero cuando como en el presente caso de la propia solicitud aparece que el auto va dirigido contra un alto funcionario público del gobierno de Puerto Rico y que envuelve la resolución de una cues-

tión tan importante como la legalidad de la continuación de las sesiones de la Asamblea Legislativa por un largo período de tiempo, nos pareció conveniente expedir directamente el auto.

También ha hecho objeción el demandado a la suficiencia de la solicitud alegando que el peticionario no tiene capacidad legal para pedir el remedio que solicita, que no expone hechos que demuestren que tiene interés en el asunto, y que tiene otro remedio en el curso ordinario de la ley.

Esos tres motivos los argumenta conjuntamente el demandado y en igual forma los trataremos nosotros.

En apoyo de esa tesis cita, sin comentarios, la opinión disidente del Juez Sr. Temple en el caso de *Harpending* v. *Haight,* 39 Cal. 216. En este caso la petición de *mandamus* se sometió a la Corte Suprema por un convenio de las partes en el que, entre otras cosas, se alegó que por tener el peticionario interés en el resultado del procedimiento era propia parte en él. Tenía por objeto que se resolviera si por no haber devuelto el Gobernador al Senado dentro de diez días, exceptuando los domingos, un proyecto de ley decretado por la Asamblea Legislativa había quedado convertido en ley, habiendo convenido, además, las partes en que si esto era así procedía librarse el auto perentorio ordenando al demandado que autenticase dicha ley según se disponía en la que regía para autenticación de las leyes que no son aprobadas por el Gobernador. La Corte Suprema resolvió que se expidiera el auto perentorio de *mandamus,* disintiendo únicamente el Juez Sr. Temple. La mayoría de la corte no consideró en su opinión si el peticionario tenía interés en el asunto. Parece que descartó esta cuestión en vista del convenio de las partes. Solamente el juez disidente la consideró llegando a la conclusión de que el peticionario tenía otro recurso sencillo, rápido, eficaz y adecuado, porque teniendo su petición por objeto conseguir que existiera un procedimiento (*record*) oficial de los actos del ejecutivo en cuanto a la ley en contro-

versia, podía lograr esto en un procedimiento directo bajo la expresada ley considerándola y tomándola como ley; y que no tenía interés en el asunto, a pesar de la estipulación en contrario, porque siendo la ley para abrir una calle pública no tenía ningún derecho en virtud de ella en una calle que todavía no existía, aun siendo dueño del terreno que se trataba de tomar para ella, por lo que su interés era igual al de cualquier otro ciudadano.

Aunque pudiera ser que el peticionario en el presente caso pudiera conseguir los resultados de la ley, si en efecto es ley, en otro procedimiento dirigido contra el Comisionado del Interior que es el llamado a cumplirla, como el derecho del peticionario sería claro y la obligación del Comisionado del Interior más clara todavía, nos parece que aquél tendría perfecto derecho para solicitar un auto de *mandamus* contra dicho Comisionado y no tendría necesidad de acudir a un pleito ordinario, por lo que no resulta de gran importancia si el procedimiento de *mandamus* debe ser dirigido contra el Comisionado del Interior o contra el Secretario Ejecutivo de Puerto Rico. Además, puesto que el artículo 22 de la Ley Orgánica ordena que el Secretario Ejecutivo registre y conserve las leyes decretadas por la Asamblea Legislativa y que las promulgue, nos parece claro que cualquiera persona beneficiada por una ley tiene derecho a que tal ley esté archivada y promulgada como las demás leyes y que, por tanto, puede dirigir el procedimiento de *mandamus* contra el Secretario Ejecutivo de Puerto Rico.

Resueltas las cuestiones previas propuestas por el demandado, podemos pasar a la consideración de los méritos del caso, o sea, si aunque el proyecto de ley referente al pozo artesiano de Quebradillas no fué firmado por el Gobernador, no obstante se convirtió en ley porque estando la Asamblea Legislativa reunida en sesión ordinaria no lo devolvió con sus objeciones a la Cámara de origen dentro de los diez días de haberlo recibido.

Como hemos visto, la Asamblea Legislativa abrió su sesión ordinaria el 13 de agosto de 1917 y el día 26 de noviembre del mismo año, por consentimiento expreso y mutuo de ambas Cámaras, suspendió sus sesiones hasta el primer lunes 4 de febrero del año siguiente, en virtud de la resolución conjunta que dice así:

"RESOLUCIÓN CONCURRENTE

"Para suspender las sesiones de la presente Legislatura, hasta el día 4 de febrero de 1918.

"POR CUANTO, la presente Legislatura ha desarrollado una labor intensa a causa de los distintos problemas sometidos a su consideración, entre los que se encuentran algunos de importancia primordial relacionados con la implantación del nuevo régimen;

"POR CUANTO, el Senado y la Cámara de Representantes han aprobado muy importantes proyectos que requirieron largo tiempo y detenido estudio, figurando entre ellos, en primer término, los de carácter económico, adoptados para evitar el desequilibrio en nues-· tras rentas producido por la prohibición sobre alcoholes que fué acordada por el Congreso de los Estados Unidos, para someterla al *referendum* de El Pueblo de Puerto Rico, y que merma los ingresos del Tesoro en más de un millón cuatrocientos mil dólares;

"POR CUANTO, están aun pendientes de resolución ciertos proyectos de ley presentados en ·esta Legislatura que deben ser cuidadosamente estudiados por las comisiones que han de emitir informes sobre ellos, para que lleguen a ser leyes adoptadas de acuerdo con las necesidades públicas;

"POR CUANTO, la actual guerra agrava de día en día nuestra situación financiera; hace cada vez más difícil la vida del pueblo; crea serios conflictos en el orden social y mantiene una situación anormal a la que debe nuestra Legislatura dedicar una atención constante, para, en lo que es posible dentro de sus atribuciones, corregir o evitar los males existentes y los que puedan sobrevenir;

"POR CUANTO, es conveniente, para tales fines, suspender las sesiones de ambas cámaras legislativas por el tiempo necesario, para estudiar e informar dichos proyectos de ley;

"POR· CUANTO, ambas cámaras legislativas, de común acuerdo, pueden suspender sus sesiones por más de tres días, conforme a lo provisto en el artículo 34 de la Ley Orgánica vigente;

"POR TANTO, *Resuélvese por el Senado y la Cámara de Representantes de Puerto Rico:*

"Sección 1.—La Cámara de Representantes y el Senado de Puerto Rico suspenden sus sesiones hasta el día cuatro de febrero de mil novecientos diez y ocho, y volverán a reunirse a las diez de la mañana del expresado día.

"Sección 2.—Esta Resolución empezará a regir desde la fecha de su aprobación por ambos cuerpos legislativos."

Como el peticionario alega en su solicitud que tal suspensión fué un acto legal y autorizado por la ley y que por no haber devuelto el Gobernador dicho proyecto de ley con sus objeciones dentro de los diez días siguientes al 25 de noviembre en que le fué entregado llegó a ser ley sin su aprobación y firma, sostiene en contrario el demandado, por voz de su abogado, el Fiscal General de esta isla, que el artículo 31 de la Ley Orgánica no concede autorización afirmativa a la Asamblea Legislativa de esta isla para continuar en sesión indefinidamente y que su precepto es de carácter restrictivo, con la idea de que el trabajo legislativo termine dentro de noventa días; que no fué la intención de ese artículo el hacer nulas con una sesión indefinida otras disposiciones de la misma ley que otorgan al Gobernador, entre otras cosas, treinta días para considerar un proyecto después que le ha sido presentado, la que le da poder para hacer nombramientos mientras la Legislatura no está en sesión y el derecho de convocar a sesiones extraordinarias en cualquier tiempo.

Los artículos pertinentes de la ley son los siguientes:

"Art. 31.—Los miembros del Senado y de la Cámara de Representantes de Puerto Rico recibirán una compensación a razón de $7 diarios por los primeros noventa días de cada legislatura ordinaria y $1 diario por cada día adicional de dicha legislatura, mientras esté en sesión * * *."

"Art. 33.—La primera legislatura ordinaria de la Asamblea Legislativa de Puerto Rico, provista en esta Ley, se reunirá el vigésimo-octavo día después de las primeras elecciones dispuestas en la presente, y las legislaturas ordinarias de la Asamblea Legislativa tendrán efecto cada dos años después, reuniéndose el segundo lunes

de febrero del año 1919, y el segundo lunes de febrero cada dos años después. El Gobernador podrá convocar a la Asamblea Legislativa o al Senado a sesiones extraordinarias en cualquier tiempo en que a su juicio los intereses públicos lo requieran; pero ningún período de sesiones extraordinario continuará por más de diez días, no incluyendo domingos y días festivos, y no se tomará en consideración en dicho período de sesiones ninguna otra legislación que la especificada en la convocatoria; y convocará al Senado a sesiones extraordinarias por lo menos una vez cada año, el segundo lunes de febrero de aquellos años en que no se provea para una legislatura ordinaria de la Asamblea Legislativa.''

De estos preceptos resulta claro que hay dos clases de sesiones que puede celebrar la Asamblea Legislativa de Puerto Rico; una que es la ordinaria, que comienza el día en que está determinado en la ley; la otra, que se celebra cuando el Gobernador la convoca para asuntos de interés público, diferenciándose ambas en cuanto al tiempo de duración de sus sesiones en que la que se celebra por convocatoria del Gobernador ha de terminar necesariamente dentro de diez días por precepto imperativo de la ley, mientras que en cuanto a la otra, la ordinaria, la regular, la que se reúne por precepto de la ley, no se le fijó tiempo de duración, como se hizo para las sesiones extraordinarias y quedó al criterio de la Asamblea Legislativa la fecha de terminarla.

Tal como está redactada la ley no fijando término a la sesión ordinaria como lo hizo para la extraordinaria, y declarando solamente en cuanto a ese particular lo que habrán de cobrar los senadores y representantes durante los primeros noventa días de sesión y lo que habrán de cobrar durante los siguientes días, claramente está expresando el legislador su pensamiento de que nuestra Legislatura puede estar reunida en sesión ordinaria por más de noventa días y por tanto que pudo suspender su sesión hasta el día 4 de febrero, primer lunes de dicho mes, juzgándolo, como lo juzgó, conveniente para los intereses públicos.

Pero además de estas razones que surgen del texto de la

ley sus antecedentes demuestran sin género alguno de duda que la intención del legislador fué que la sesión regular podía durar más de noventa días.

El proyecto de ley original disponía en su artículo 33 que ninguna sesión regular duraría más de noventa días, excluyendo los domingos y días festivos y aquellos durante los cuales ambas Cámaras acordasen estar en receso, con la aprobación del Gobernador. Esto fué suprimido luego y el comité. de las islas del Pacífico y de Puerto Rico en el Senado, propuso que el artículo 31 se enmendara para que dijese, como dice la ley aprobada, que se pagaría a los senadores y representantes $7 por los primeros noventa· días de cada sesión ordinaria y $1 por cada día adicional de tal sesión, aduciendo como razón de la enmienda que "se cree que los asuntos de la Legislatura pueden quedar terminados en noventa días, pero en vez de establecer una limitación, el comité pensó en que surgirían casos en que fuera necesaria una sesión más larga y, por tanto, queda permitida, aunque la reducción de la dieta, así lo esperamos, será un sano estímulo para una actuación diligente. Además, se evitará de ese modo la práctica de derrotar proyectos de leyes por medio de tácticas dilatorias a las cuales se recurre cuando el término de la sesión legislativa está fijado por limitación constitucional."

Estos antecedentes demuestran que si bien hubo en un principio la idea de restringir la sesión regular a sólo noventa días se prescindió luego de ella y que al redactarse el artículo 31 tal como existe en nuestra ley se tenía presente que la sesión regular podía durar más de noventa días; y aunque la reducción de la dieta tuvo por objeto apremiar a los legisladores para que apresurasen sus trabajos no puede en modo alguno tener el alcance, ni lo tiene, de una limitación a sólo noventa días de la sesión regular.

Como la Ley Orgánica concede al Gobernador el derecho de convocar la Asamblea Legislativa a sesión extraordinaria cuantas veces lo crea conveniente en interés público, arguye

el demandado que no podemos declarar que la sesión regular de la Asamblea Legislativa puede durar indefinidamente sin privar al Gobernador de tal derecho.

Es cierto que mientras la Asamblea Legislativa está en sesión regular el Gobernador no puede convocarla a sesión extraordinaria, pero no por ser esto así estamos autorizados para poner limitación arbitraria al tiempo durante el cual la Legislatura puede estar reunida en sesión regular, pues a pesar de que el legislador debió tener esto en cuenta el Congreso no quiso fijar límites rígidos al tiempo de la reunión y, por tanto, nosotros no podemos reducirlo ni concretarlo a noventa días. Aunque el artículo 34 de la ley dispone que ningún proyecto de ley, excepto únicamente el de presupuesto general para los gastos del gobierno, presentado en cualquiera de las cámaras de la Asamblea Legislativa después de los primeros cuarenta días de la Legislatura pasará a ser ley, no limita el tiempo que puede tomar para deliberar sobre los proyectos de ley presentados durante ese tiempo y no debemos presumir que si durante un largo período de sesiones de la Asamblea Legislativa y después de sus primeros cuarenta días ocurrieren hechos de tal importancia que hicieran necesario que se legislara respecto de ellos, la Asamblea Legislativa mirando por el interés público no suspendería *motu propio* su sesión para dar oportunidad al Gobernador a convocarla a sesión extraordinaria para legislar sobre esas materias, como lo hizo en este caso el 6 de febrero.

Se alega también por el demandado que a pesar de que la Constitución de Missouri tiene un párrafo similar a nuestro artículo 31 nunca ha surgido allí una cuestión parecida a la que nos ocupa porque aquella Legislatura nunca ha actuado bajo la presunción de que tenía el poder de continuar en sesión indefinida. En Missouri no puede darse el caso que ha ocurrido en esta isla porque el artículo 21 de aquella Constitución dispone expresamente que cualquiera suspensión de la Asamblea Legislativa por más de tres días

tendrá el efécto de ser suspensión *sine die* y, por tanto, cierre final de la Legislatura.

El argumento que se hace de que una larga sesión de la Asamblea Legislativa privaría al Gobernador de su derecho dé hacer nombramientos mientras la Legislatura está cerrada da por sentada la cuestión en controversia y no puede prevalecer, pues mientras la Legislatura esté en sesión no existe tal derecho y el Gobernador puede hacer nombramientos. La diferencia será que, toda vez que todos los nombramientos, que hace el Gobernador están sujetos a la aprobación del Senado, estando en sesión la Asamblea Legislativa tendrá que enviarlos al Senado para su aprobación tan pronto los haga, mientras que si no está reunida el nombramiento surtirá efecto desde luego hasta que se reúna la Asamblea Legislativa o el Senado sea convocado a sesión. Lo único que ha hecho la ley es suministrar un medio supletorio, en bien de la administración pública, para cuando no puede ser impartida la aprobación al nombramiento.

El otro argumento de que se priva al Gobernador de treinta días para aprobar un proyecto de ley, que tiene cuando la Legislatura ha cerrado su sesión, puede contestarse en forma idéntica al anterior pues en realidad esos treinta días no existen sino cuando la Asamblea Legislativa ha cerrado su sesión antes de transcurrir los diez días que tiene para resolver respecto a los proyectos de ley que han sido presentados al Gobernador, tiempo que se extiende entonces en atención a que por el acto de la Asamblea Legislativa de cerrar su sesión no podrá devolver el proyecto a la cámara de origen.

El veto absoluto que tenían los tribunos romanos y que la Constitución Británica reconoce a la corona no lo tienen los Estados Unidos de América, pues aunque en Inglaterra no se usa de él desde hace muchos siglos, sin embargo se abusó tanto de esa facultad en las colonias americanas antes de su independencia que ese fué uno de los motivos de la.

revolución y ha sido causa de que las constituciones americanas no lo reconozcan sino como una excepción, cuando la Asamblea Legislativa cierra sus sesiones. El veto americano es cualificado porque dentro de un período de tiempo que fluctúa entre tres, cinco, seis o diez días de presentarse los proyectos al Presidente o a los Gobernadores de los Estados, según las distintas constituciones, deben esos jefes aprobarlos o devolverlos con sus objeciones a la Cámara de origen para que puedan ser reconsiderados, so pena de que si no los devuelven se convierten en ley. Este es el principio sano en los países democráticos donde sólo existe el veto absoluto generalmente llamado "veto de bolsillo" (*pocket-veto*) cuando por cerrar la asamblea su sesión priva al Presidente o a los Gobernadores de la oportunidad de devolver los proyectos con sus objeciones para nueva consideración.

Así pues, no teniendo la Asamblea Legislativa en Puerto Rico limitado a un determinado número de días el tiempo que ha de durar su sesión ordinaria, puesto que está autorizada por la Ley Orgánica para suspender su sesión por más de tres días con la sola limitación de que el acuerdo ha de ser tomado por ambas Cámaras, y puesto que cuando está en sesión el Gobernador debe devolver a la Cámara de origen los proyectos de ley que no aprueba con sus objeciones dentro de diez días de haberlos recibido, porque si así no lo hace se convierten en ley sin su aprobación y firma, la verdadera cuestión en el presente caso es si la suspensión de sesiones que ambas Cámaras acordaron el 26 de noviembre de 1917 para continuar la sesión el día 4, primer lunes de febrero siguiente, impidió o no que el Gobernador devolviese a la Cámara de origen el proyecto de ley en que está interesado el municipio de Quebradillas con sus objeciones, ya que no lo aprobó, pues si no impidió tal devolución, el expresado proyecto de ley se convirtió en ley el día 6 de diciembre de 1917.

Que no impedía la devolución lo demuestra el hecho de

que después de suspendida la sesión en 26 de noviembre de 1917 el Gobernador devolvió los siguientes proyectos y resoluciones que no aprobó, exponiendo sus objeciones, a saber: Al Senado, en 27 de noviembre de 1917, el proyecto No. 61 y el No. 129; el 28 de noviembre el No. 1; el día 4 de diciembre el No. 162; el día 5 de diciembre el No. 30; el 7 de diciembre la Resolución Conjunta No. 13 y también el proyecto No. 107; a la Cámara de Representantes devolvió el 26 de noviembre el proyecto No. 34; el 26 de noviembre el No. 40; el 27 de noviembre el proyecto No. 115 y las Resoluciones Conjuntas Nos. 5, 24, y 44; el día 3 de diciembre devolvió los proyectos Nos. 18 y 157; el día 5 de diciembre el 303; el día siguiente los Nos. 26 y 37 y el día 7 de diciembre los numerados 5, 38, 86, 102, 125, 133, 159, 262, 309 y la Resolución Conjunta No. 7.

Sin embargo, veamos lo que dice la ley:

Dispone el Artículo 34 entre otras cosas lo siguiente:

" \* \* \* Ningún proyecto de ley pasará a ser ley hasta que sea aprobado en cada cámara en votación por lista por una mayoría de todos los miembros que la componen y registrado en el libro de actas, y haya sido aprobado por el Gobernador dentro de los diez días siguientes. Cuando un proyecto de ley que haya sido aprobado se presente al Gobernador para su firma, si éste lo aprobare, lo firmará, si no lo aprobare, lo devolverá con sus objeciones a la cámara en donde se originó, la cual anotará dichas objeciones por extenso en su libro de actas y procederá a reconsiderar el proyecto. Si después de dicha reconsideración las dos terceras partes del número total de miembros de esa cámara convinieren en pasar el proyecto, será el mismo enviado, junto con las objeciones, a la otra cámara, por la cual será también reconsiderado, y si fuere aprobado por las dos terceras partes de todos los miembros de esa cámara, será remitido al Gobernador, quien, en caso de que entonces no lo aprobare, lo transmitirá al Presidente de los Estados Unidos. Los votos de cada cámara se emitirán por lista y los nombres de los miembros que votaren en favor y en contra del proyecto se harán constar en el acta. Si el Presidente de los Estados Unidos aprobare el proyecto, lo firmará y pasará a ser ley. Si no lo aprobare, lo devolverá al Gobernador manifestándolo así, y no será ley; *Dis-*

*poniéndose,* que el Presidente de los Estados Unidos aprobará o desaprobará una ley a él sometida en virtud de las disposiciones de este artículo, dentro de noventa días de haberle sido sometida para su aprobación; y si no lo aprobare dentro de ese plazo, se convertirá en ley como si la hubiese aprobado especialmente. * * * Si cualquier proyecto de ley no fuere devuelto por el Gobernador dentro· de diez días (exceptuando los domingos) después de habérsele presentado, pasará a ser ley del mismo modo que si lo hubiera firmado, a menos que la Asamblea Legislativa, levantando sus sesiones, impidiere su devolución, siendo en ese caso ley si lo firmare el Gobernador dentro ·de treinta días después de recibirlo; en caso contrario no será ley. * * *''

Estudiada la cuestión con sólo el precepto de la ley nos parece claro que puesto que la Asamblea Legislativa puede suspender su sesión en cualquier tiempo por más de tres días para reanudarla en otro fijado por ella, esa suspensión no pone término definitivo a la sesión regular ni es el cierre de la Legislatura, puesto que transcurridos los días de suspensión o de receso pueden legalmente reunirse otra vez para continuar la misma sesión regular y por tanto no impide la devolución por el Gobernador de los proyectos de ley que no apruebe, porque tal impedimento sólo puede ocurrir cuando la sesión ha sido suspendida finalmente porque entonces la Legislatura no puede reconsiderar el proyecto y, por tanto, es innecesario que se lo devuelva al Gobernador y el proyecto muere si no se aprueba dentro de treinta días. Pero mientras la Legislatura está constituída en sesión por no haber acordado el cierre o suspensión final de ella, ·cualquiera suspensión temporal no impide la devolución. Sostener lo contrario equivaldría a destruir el precepto de la ley que autoriza la suspensión por más de tres días, pues cualquiera suspensión por corta que fuere tomada mientras hay proyectos de ley sometidos a la aprobación del Gobernador podría producir el resultado de que no pudiera ser devuelto el proyecto de ley a la cámara de origen cuando dejara de aprobarlo el Gobernador.

De las propias disposiciones de la ley resulta que para

el legislador existen tres clases de suspensioues: una que puede cualquier cámara tomar por sí misma, no excediendo de tres días, otra temporal de la Asamblea Legislativa por más de tres días para reunirse en otro día determinado, tomada por acuerdo mutuo de las dos Cámaras, y otra final cuando la Asamblea Legislativa suspende sus sesiones para no reunirse otra vez, o sea la suspensión *sine die.* La primera y la segunda no impiden la reconsideración del proyecto de ley que el Gobernador no aprueba; la tercera sí la impide porque después de terminada la sesión no tiene la Legislatura oportunidad de reconsiderar tales proyectos. Como consecuencia de lo dicho, la suspensión final *sine die* es la única que impide la devolución y es la única a que se refiere el artículo 34 de nuestra ley y no a las otras clases de suspensiones temporales o de recesos.

La cuestión que nos ocupa se ha suscitado varias veces en los Estados de la Unión Americana aunque nunca ha llegado al Tribunal Supremo de los Estados Unidos pues, como veremos después, el único caso que hemos encontrado y que se cita por el demandado, el de *La Abra Silver Mining Co.* vs. *United States,* 175 U. S. 423, no resuelve esta cuestión, sino la de si el Presidente puede firmar válidamente un proyecto de ley durante una suspensión del Congreso por más de diez días.

En apoyo de su argumento expone el demandado que de acuerdo con la opinión del Fiscal General de los Estados Unidos, Sr. Miller, rendida al Presidente en el año 1892, Vol. XX, Opi. A. G. U. S. 507, y toda vez que el artículo 1, Sección 7ª., Cláusula 2ª. de la Constitución es similar a nuestro artículo 34, si el Congreso o la Asamblea Legislativa de Puerto Rico toman un receso o suspensión de sesiones de tanta duración que el Presidente o el Gobernador no pudiese devolver el proyecto de ley con sus objeciones a la Cámara de origen dentro de los diez días de haberlo recibido, no se convertirá en ley a la expiración de dicho término.

Es cierto que en esa opinión se consigna que un receso se considera una suspensión y que una suspensión por cierto número de días es una suspensión dentro del significado de los preceptos que estamos considerando, pero no sostiene definitivamente que el proyecto de ley no se convertiría en ley, aunque le parece que esa sería la conclusión. Mas a pesar de esas manifestaciones, opinó que si era la práctica devolver a las cámaras los proyectos de ley con sus objeciones después de diez días, podía continuarla y le aconsejó que los firmase o vetase si le parecía que debían ser aprobados o no, devolviéndolos cuando el Congreso se reuniese otra vez, permitiendo de ese modo que la cuestión la resolvieran los tribunales de justicia. Como se ve, no llegó definitivamente a la conclusión que le atribuye el demandado. Además, no era esa la cuestión que le estaba sometida sino la de si el Presidente podía aprobar o desaprobar proyectos de ley que se le sometían antes de un receso o suspensión temporal cuando ésta excedía de diez días. Por otra parte hace constar en su opinión que la cuestión había sido resuelta de distinta manera en los casos *In re Opiniones de los Jueces,* 45 N. H. 610 y en el de *Harpending* vs. *Haight,* 39 Cal. 206. Por estas razones, esa opinión no tiene gran fuerza para apoyar la contención del demandado.

Estas citas no traen luz alguna al asunto que ventilamos porque en ellas se trataba de proyectos de ley aprobados por el Presidente dentro de los diez días de haberle sido presentados, cuando el Congreso había suspendido sus sesiones por más de diez días, y expresamente dijo el Tribunal Supremo de los Estados Unidos en el primero de dichos casos que sólo resolvía la cuestión de que el Presidente podía firmar los proyectos en esas condiciones. Podríamos a la inversa decir que si los podía firmar es porque el Congreso estaba en receso y no había suspendido finalmente sus sesiones, autorizados porque el señor Harlan no conside-

raba tal receso como suspensión final, toda vez que en la página 455 dice:

"Si el Presidente puede firmar un proyecto de ley después de una suspensión final del Congreso (*final adjournment*) es cuestión no suscitada en este caso y que no ha sido considerada y decidida por nosotros. Resolvemos—y con respecto a este aspecto del caso nada más resolvemos—que habiendo sido presentada la ley de 1892 al Presidente mientras el Congreso estaba reunido (*sitting*) y habiéndolo firmado cuando el Congreso estaba en receso (*in recess*) por tiempo determinado, pero dentro de los diez días, con excepción de los domingos, después que le fué presentada, su aprobación fué válida e inmediatamente fué ley, a menos que sus disposiciones sean contrarias a la ley."

Como se ve, a una suspensión por varios días la llama receso, distinguiéndola así de la suspensión final.

Se citan estos casos para sostener que la validez de esas leyes no hubiera sido tan extensamente discutida, ni se hubiera resuelto por los tribunales que una ley aprobada por el Presidente durante un período de suspensión de sesiones del Congreso mayor de diez días era válida, si el abogado del Gobierno y los tribunales hubieran sido de opinión que los proyectos se habían convertido en ley sin la firma del Presidente por no haberlo devuelto dentro de diez días; y el caso de *People* v. *Kaiser,* 135 N. Y. S. 274, 206 N. Y. 40, 150 App. Div. Rep. 541, se menciona en apoyo de esta manera de razonar.

Sin embargo, como el Presidente firmó las leyes, la cuestión que necesariamente surgía de este hecho era la de si podía válidamente firmarlas durante una suspensión de las sesiones del Congreso por más de diez días, y no la de si era ley por no haberla devuelto el Presidente dentro de diez días pues aunque esto era cierto también lo era que no habían quedado sin su firma y, por tanto, no cabía discutir y resolver el efecto de no haberla firmado y de no devolverla.

Sostiene también el demandado que un caso reciente de New Jersey resuelto en el año 1912, *In re* Ley para enmen-

dar una ley titulada "Ley relativa a utilidades públicas," 84 Atl. 706, es de exacta aplicación al presente caso porque resuelve que un proyecto de ley presentado al Gobernador antes de un receso de la Legislatura no se convierte en ley sin la aprobación del Gobernador.

El argumento principal de esa sentencia es que la frase suspender la sesión, usada en la ley, significa no una suspensión *sine die* o final sino cualquiera suspensión, porque en la Constitución no existe tal diferencia. Sin embargo, hemos visto que el Tribunal Supremo en el caso de la Abra, *supra,* distingue entre esas dos clases de suspensiones y que en verdad en la ley existe tal diferencia, porque permite una suspensión por determinado período de tiempo por mutuo acuerdo de las cámaras si es mayor de tres días, para reanudar después la misma sesión regular, suspensión que es distinta de la final porque con ésta no volverán a reunirse los legisladores; y aunque también se sostiene en ese caso que durante la suspensión por varios días no tiene el Gobernador oportunidad de devolver los proyectos a la cámara de origen porque no puede entregarlos a ningún funcionario de la cámara, sin embargo, como veremos luego, el peso de las autoridades es que sí puede hacerlo. Además, en este caso el Gobernador devolvió el proyecto con sus objeciones a la cámara de origen cuando se reunió de nuevo la Legislatura y habiendo aquélla aprobado otra vez el proyecto, el Senado dejó de aprobarlo. En verdad, ésta era la verdadera cuestión ante el tribunal. Después de todo, esa sentencia no tiene otra autoridad que las de los jueces que resolvieron el caso, pues no tiene cita alguna de otras decisiones, a pesar de que entonces ya se habían dictado muchas en sentido contrario.

El otro caso de *State* vs. *Town of South Norwalk,* 58 Atl. 759, fallado en Connecticut el año 1904, es idéntico en todo al precedente, aunque parece admitir que el Gobernador podía devolver el proyecto de ley cuando se reuniera de nuevo

la Legislatura. También le son aplicables las consideraciones que antes hemos expuesto, inclusa la de que descansa únicamente en su sola autoridad, pues no hace referencia a la de otros tribunales o autores respetables.

La última cita que se hace por el demandado es la del caso de *People* vs. *Hatch,* 33 Ill. 135, pero los hechos de este caso son distintos a los presentes. Si bien allí en el año 1863 disponía también la Constitución que el Gobernador debía devolver los proyectos de ley que no aprobase con sus objeciones dentro del término de diez días y que si no lo hacía se convertirían en ley como si los hubiera firmado, a menos que la Legislatura levantando sus sesiones impidiera la devolución, sin embargo, cuando el proyecto de ley objeto de la sentencia fué entregado al Gobernador el 12 de junio de 1863 ya estaba finalmente suspendida la sesión que había empezado en enero de aquel año porque el Gobernador la cerró dos días antes, el 10 de junio de 1863, en vista del desacuerdo existente entre ambas Cámaras respecto a la fecha en que habían de suspender sus sesiones *sine die,* pues mientras el Senado propuso que fuera el día 8 de junio, la Cámara de Representantes quería que fuera el 22 de junio, enmienda que no concedió el Senado y en esa situación las cosas el Gobernador usó de la facultad que para tal caso le concedía la Constitución y la suspendió hasta el mes de enero del año 1865, decreto que fué obedecido por los presidentes y la mayoría de los miembros del Senado, quienes abandonaron la sala de sesiones, arreglaron sus cuentas con el contador y se marcharon para no volver, menos un pequeñísimo número que hizo constar en el diario de sesiones una vigorosa protesta por la conducta del Gobernador y que no volvieron a reunirse sino en número de cuatro o seis hasta el día 23 de junio, acordando el 24 la suspensión hasta enero de 1864. La suspensión en ese caso fué inevitablemente final el 10 de junio y, por tanto, no podía ser ley sin la firma del Gobernador el proyecto que se le pre-

sentó dos días después.   Además, los particulares de la opinión de los jueces al resolver ese caso respecto de que para que el Gobernador pueda devolver los proyectos que no aprueba a la otra Legislatura en sesión organizada durante todo el período de los diez días y que no está obligado a devolverlos al Presidente de la Cámara ni a ninguno de sus empleados, son contrarios a toda la jurisprudencia posterior que es numerosa, y también al único caso que hasta entonces había sido decidido, que era el de *In re Opiniones de los Jueces,* 3 Mass. 567, resuelto en el año 1791.

En apoyo de la teoría contraria, que es la sostenida por nosotros, están, no solamente el caso más antiguo que acabamos de mencionar de Massachusetts, sino los de *In re Opiniones de los Jueces,* 45 N. H. 610 (año 1864); *Harpending* v. *Haight,* 39 Cal. 189 (año 1870); *Miller* v. *Murford,* 9 N. W. 475 (Neb. año 1871.); *Hequembourg* v. *City of Dunkirk,* 2 N. Y. Supp. 447, 49 Hun. 557, (año 1888); *State ex rel. State Pharmaceutical Association* vs. *Michel,* 52 La. Ann. 936, 49 L. R. A. 224 (año 1900); y especialmente el de *Johnson City* v. *Tennessee Eastern Electric. Co.,* 182 S. W. 587, que es el más reciente publicado pues es del año 1916, y en él no solamente se consignan todos los casos anteriores que apoyan sus conclusiones, que hemos citado, sino que se examinan y rebaten las consideraciones expuestas en los casos de *People* v. *Hatch,* de Illinois, y el de *State* v. *Norwalk,* de Connecticut, *supra.*   En el caso primeramente acabado de citar del año 1791, los Jueces del Tribunal Supremo, evacuando una consulta del Senado, cosa que allí podía hacerse, decidieron que si un proyecto de ley o resolución se presentaba al Gobernador para su aprobación con menos de cinco días antes de cualquier receso y no lo devolvía con sus objeciones, se convertía en ley porque tódos los días se consideran la sesión, aunque exista una suspensión.

Aunque expone el demandado que tal opinión se basa en una disposición constitucional distinta a la nuestra, sin em-

bargo no lo creemos así, pues allí también dispone la ley que si el Gobernador no devuelve los proyectos de ley dentro de cinco días de habérsele presentado, tendrán fuerza de ley.

El siguiente caso del año 1864, también fué una opinión que rindieron los jueces de New Hampshire siendo el precepto constitucional, como el nuestro, que si el Gobernador no devuelve los proyectos de ley con sus objeciones a la Cámara de origen, dentro de cinco días (excepto los domingos) después de haberle sido presentados, serán ley, como si los hubiera firmado, a menos que la Legislatura, suspendiendo sus sesiones, impida la devolución, en cuyo caso no serán ley. Entonces se declaró que el último de los cinco días en el cual ninguno de los cuerpos colegisladores estaba en sesión debía ser contado como uno de los cinco días especificados y que la suspensión de sesiones mencionada en la Constitución de New Hampshire no se refería al receso o suspensión corriente de tiempo en tiempo durante el período de sesiones sino a la suspensión final al cerrar la sesión.

No hemos podido encontrar el libro que contiene este caso; pero aparece citado, según lo transcribimos, en el Volumen XX, Opi. A. G. U. S., página 504. También se hace referencia a él en 36 Cyc. 962, nota 53, como declarativo de que la devolución puede hacerse dejando el proyecto en la mesa del Presidente de la Cámara.

La objeción que se hace a este caso por el fiscal general es que sin duda alguna el proyecto debía devolverse el día 23 por ser domingo el 21 y que el 23 la Legislatura estaba reunida. Sin embargo, según la cita que de este caso se hace en *Harpending* vs. *Haight,* 39 Cal. 204, el proyecto de ley debía devolverse en todo el lunes 22, en cuyo día la Cámara de Representantes no estaba en sesión, lo que destruye la objeción que se le hace.

El inmediato caso que consideramos es el expresado antes, de Harpending, que plantea y resuelve las cuestiones que

ahora tenemos en este procedimiento y que ha sido citado con aprobación en los demás casos que posteriormente han sido resueltos.

Los hechos de ese caso fueron los siguientes: desde el 10 de marzo de 1870 la Legislatura no había tomado receso alguno; el 19 de marzo fué presentado al Gobernador el proyecto de ley, cuya validez se discutía; el 31 del mismo marzo, a las 4 de la tarde, suspendió el Senado la sesión hasta el día siguiente, a las 11 de la mañana; media hora después de esa suspensión, a las 4:30, el secretario del Gobernador llevó el proyecto con sus objeciones al Senado y encontrando suspendida la sesión lo entregó de nuevo al Gobernador, quien lo retuvo y el día primero de abril comunicó al Senado que por haberle impedido la devolución no se había convertido en ley.

Copiamos de ese caso lo siguiente de la pág. 203:

"El Senado tiene el indiscutible derecho constitucional de suspender sus sesiones por tres días consecutivos. (Art. 4º., sección 15, Constitución.) Puede suceder algunas veces que estos tres días incluyan el último día permitido al ejecutivo para ejercitar su poder de veto contra algún proyecto de ley del Senado. Ahora bien, si el mero hecho del receso del Senado, así constitucionalmente tomado, opera como obstáculo, en cualquier modo, al ejercicio del poder de vetar conferido al ejecutivo por la Constitución, entonces tendremos el extraño espectáculo de un conflicto irreconciliable entre disposiciones de la misma ley por el cual el Senado, por el mero ejercicio de su reconocido derecho constitucional que le autoriza para suspender sus sesiones violaría el igualmente claro derecho constitucional del ejecutivo de conservarlo en sesión. Somos de opinión que esa suspensión del Senado en marzo 31 no impide el poder del veto del ejecutivo sobre el proyecto de ley en cuestión ni le impediría en su ejercicio. La devolución debía haber sido hecha según las circunstancias lo permitían; de todos modos debía dejarse el proyecto fuera de la custodia del ejecutivo y si fuera preciso, en la custodia inmediata de alguna persona adecuada que lo entregase al Senado en la primera oportunidad. La mejor entrega que las circunstancias permitieran sería, en nuestra opinión, una devolución adecuada. La máxima *lex non cogit ad impossibilia* sería aplicable a tal clase de asuntos."

La opinión hace luego referencia al caso de New Hampshire de que tratamos antes, y continúa, página 205:

"Si ha suspendido (el Senado) su sesión por un día o por tres tiene, sin embargo, existencia organizada como cuerpo legislativo, con su presidente, secretario y otros oficiales a quienes, bajo tales circunstancias, puede hacerse una entrega subsidiaria del proyecto y quienes tienen el deber oficial de entregarlo al Senado tan pronto como sea posible.  Tal devolución, como hemos dicho sería solamente la que permitan las circunstancias y cuando el proyecto llegue después al Senado podría entonces reconsiderarlo, como lo requiere la Constitución.  Pero cuando tiene lugar una suspensión final de la Legislatura entonces termina la existencia organizada del Senado. Ya no hay oficiales que lo representen para ningún propósito ni podría el proyecto de ley, de acuerdo con la naturaleza de las cosas nunca más ser sometido a su consideración porque no estaría más en sesión en adelante ni podría ser considerado ese propósito que se trata de obtener porque no tendría existencia."

Después de hacer referencia a que la Constitución de los Estados Unidos es similar a la de California en ese particular (y también a la nuestra) dice, pág. 206:

"Parece que ha sido la opinión del Juez Sr. Story (Com. on Constitution, sección 891), que la única suspensión que impediría al Ejecutivo Federal devolver un proyecto de ley dentro del tiempo prescrito tiene que ser una suspensión que equivalga a 'una terminación de la sesión.'"

Aunque es cierto como dice el demandado que no hubo en ese caso una suspensión como la que motiva el procedimiento en este caso, sin embargo la cuestión es la misma porque el Tribunal de California no se limitó a considerar la suspensión que allí se dió de un día para otro, sino que trató la cuestión de una suspensión por tres días, siendo los mismos principios aplicables a una suspensión por mayor número de días toda vez que constitucionalmente puede tomarla por mutuo acuerdo la Asamblea Legislativa de Puerto Rico.

Sigue en orden de fecha el caso de *Miller* v. *Hurford,* 9 N. W. 477.  Según él, antes de transcurrir los tres días que el Gobernador tenía para devolver el proyecto de ley que no

aprobaba con sus objeciones, la Legislatura suspendió sus sesiones por 62 días desde el 29 de marzo de 1881 hasta el 30 de mayo siguiente. El Gobernador retuvo el proyecto de ley hasta el 6 de junio, tres días después de haberse reunido de nuevo la Legislatura. Certificada la ley por los presidentes de ambas Cámaras surgió luego la cuestión de su validez alegándose que el Senado y la Cámara de Representantes habían suspendido la sesión antes de expirar los tres días que el Gobernador tenía para aprobarla desde que le fué presentada. El tribunal resolvió el caso diciendo que la disposición de la Constitución se refería a suspensiones *sine die,* y no a las suspensiones de tiempo en tiempo.

En cuanto a este caso parece que se resolvió por el motivo expuesto y no porque el Gobernador retuvo el proyecto hasta el 6 de junio o sea por más de tres días de estar la Legislatura en sesión. Adolece como los casos citados por el demandado de la falta de referencia a otras decisiones.

Sigue en orden el caso de *Hequembourg* v. *City of Dunkirk,* 2 N. Y. Supp. 447, del Estado de N. Y., cuya Constitución es igual a la nuestra en el particular que comentamos y en el que dispone que cuando la Asamblea Legislativa suspenda sus sesiones tendrá el Gobernador treinta días para aprobar los proyectos de ley que le hubieren sido sometidos.

Según la opinión de ese caso el 10 de febrero de 1889 fué entregado el proyecto de ley al Gobernador y mientras estaba en sus manos, la Legislatura suspendió su sesión el día 7 del mismo mes hasta el 28 de febrero. El Gobernador no lo aprobó, y 10 días después lo archivó en la Secretaría. Se sostenía que no se había convertido en ley porque la suspensión de la sesión impidió que fuera devuelto el proyecto a la Legislatura dentro de los diez días de haber sido recibido por el Gobernador. Se estableció, pues, como base, que la cuestión a resolver era si la suspensión que acordó la Legislatura impidió la devolución y con tal motivo se declaró que era idéntica a la del caso de Soldier's Voting Bill

(45 N. H. 607) en el que se estableció que la suspensión a que se refería la Constitución no eran los recesos ordinarios tomados de una fecha a otra durante el curso de la sesión, sino las suspensiones finales que cierran la sesión. Y se agrega que la cita que hace fué seguida por el Fiscal General en su opinión con respecto a la ley para cambiar el título de Banker's Life Insurance & Trust Company que aparece en la sesión de leyes de 1881 (capítulo 707, p. 942).

Aun cuando el demandado quiere distinguir este caso del nuestro fundándose en que el Gobernador tuvo allí una oportunidad de devolver el proyecto después de la suspensión de las sesiones durante más de cuatro días después del receso, no vemos cómo puede distinguirse del que estamos considerando en el que también tuvo el Gobernador la misma oportunidad que el de New York.

En otro caso, el de *State ex rel. State Pharmaceutical Asso.* v. *Michel*, 49 L. R. A. 218, resuelto en Louisiana el año 1900, también se consigna, citando el caso de New Hampshire, que suspensión significa suspensión final para los efectos de devolución y no la suspensión por un día o por varios días.

El caso más importante es el de *Johnson City* v. *Tenn. Eastern Electric Co.,* 182 S. W. 587, por haber sido resuelto hace tres años y porque hace una revisión de los casos que sostienen su opinión y porque controvierte con fuertes argumentos el caso de Illinois y el de Connecticut.

En el particular que examinamos la Constitución de Tennessee es igual a la nuestra, excepto en que el término de devolución es de cinco días en vez de diez que tiene la Ley Jones y en que después de la suspensión de las sesiones el Gobernador no tiene para aprobar los proyectos los 30 días que le concede nuestra Carta Orgánica. Bajo estos antecedentes el proyecto de ley se presentó al Gobernador el 1º. de abril de 1915; el 3 de abril la Legislatura suspendió sus sesiones hasta el 3 de mayo siguiente. El 4 de mayo, al día siguiente de abrirse nuevamente la sesión, devolvió el

Gobernador el proyecto de ley con sus objeciones pero la Cámara no lo consideró de nuevo. Estuvo en poder del Gobernador durante treinta y tres días.

Después de exponer tales hechos se pregunta el tribunal qué significa suspensión a los efectos de impedir la devolución de los proyectos de ley por el Gobernador y consignando que hay dos contenciones rivales acerca de ese extremo: una, en que insiste el apelante, respecto a que de acuerdo con la Constitución del año 1870 la devolución de un proyecto de ley con sus objeciones por escrito que se exige haga el Gobernador, si rehusa firmarlo, es necesario que se haga a la Cámara en que se originó, en ocasión en que esté presente en la Cámara un *quorum* de sus miembros competente para reconsiderar el proyecto de ley u otra clase de trabajo; siendo la otra, la que sostiene el apelado, que tal devolución puede ser hecha a cualquier oficial, agente o empleado de la Cámara que tenga el deber, de acuerdo con la interpretación de la Constitución, de entregar a la Cámara para su reconsideración el proyecto de ley y las objeciones a él del Gobernador, ya esté presente o no un *quorum* de la Cámara en el momento de la entrega del proyecto de ley con las objeciones del Gobernador, al oficial, agente o empleado de la Cámara; y después de transcribir la Sección 18, Artículo 3°., de aquella Constitución, dice, pág. 589:

"Es manifiesto de la lectura del precedente artículo que si la proposición en que insiste el apelante es la verdadera de la cual debemos partir, es decir, si la devolución es necesario que se haga a la cámara cuando un *quorum* de sus miembros esté presente, entonces el significado de la frase en el precedente artículo 'a menos que la Asamblea General por su suspensión impida la devolución,' es que cualquier suspensión que diese por resultado la ausencia de un *quorum* sería una suspensión que impediría la devolución de los proyectos de ley y por tanto resultaría que el Gobernador no podría devolver los proyectos de ley durante una suspensión que la cámara en la cual se origine tuviese para tomar su almuerzo del medio día o durante la suspensión por la noche, hasta el día siguiente o por

un período mayor de tiempo, esto es, que había cerrado finalmente la sesión.

"Si nosotros adoptamos tal conclusión necesariamente resultaría en la declaración de que el tiempo durante el cual la cámara en la que se originó el *bill* tuviera temporalmente suspendidas sus sesiones no podría ser contado como parte del tiempo limitado del derecho o poder del Gobernador para devolver proyectos de ley con sus objeciones dentro de cinco días desde que le fué presentado y por tanto para que el Gobernador supiese la cantidad de tiempo dentro del cual podía todavía actuar con respecto a determinado proyecto de ley, sería necesario que se le informase de la extensión de cada suspensión y que él agregase cada espacio de tiempo a los cinco días referidos.   Creemos que tal interpretación, daría oportunidad a muchos peligros y abusos y que esa no fué la intención de los legisladores.   La sana interpretación es la del apelado.   Suspensión, como se usa en la Constitución, significa suspensión final."

Más adelante, dice, pág. 590:

"Además, nosotros creemos que la devolución puede propíamente hacerse, dentro de la interpretación de la Constitución, a algún empleado de la cámara en la cual el proyecto se originó.   El tendría por razón de su cargo o empleo el deber de informar a la cámara cuando un *quorum* de ella estuviera presente el hecho de que el Gobernador había devuelto el proyecto de ley con sus objeciones a él."

Y más adelante dice, en la misma página.

"Una sesión de la Asamblea General es una unidad dentro del significado de nuestra Constitución.   Si fuera una sesión regular su comienzo está fijado por la Constitución, sección 8, artículo 2, y la sesión termina cuando ambas cámaras que la componen hayan suspendido su sesión *sine die*."

Los razonamientos de este caso son muy extensos y por eso no los consignaremos todos, limitándonos a expresar que después de citar la obra de Lewis "Sutherland, Statutory Construction" (edición 2ª.) en apoyo de la doctrina que establece y también de relacionar los casos que sostienen su opinión, que son los que nosotros hemos examinado anteriormente pasa a controvertir los dos casos contrarios más fuertes, haciéndolo de esta manera en la pág. 591:

"Se insiste sin embargo por el apelante que hay un conflicto de autoridades en los tribunales americanos. El conflicto es muy pequeño, si puede decirse que existe. El primer caso contrario en que descansa es el de *People* v. *Hatch,* 33 Ill. 135. El texto de la Constitución de Illinois interpretado por la corte en ese caso era sustancialmente el mismo que el nuestro con una muy importante excepción: que después de las palabras 'a menos que la Asamblea General por la suspensión de sus sesiones impida la devolución,' el artículo interpretado de la Constitución de Illinois continúa como sigue: 'en cuyo caso dicho proyecto de ley será devuelto el primer día de la reunión de la Asamblea General, después de haber expirado · dicho término de diez días.' Constitución de Illinois de 1848, art. 4, párrafo 21.

"Esta cláusula últimamente mencionada no se halla en nuestra Constitución. Si la tuviera nosotros podríamos muy bien llegar a la misma conclusión que el tribunal de Illinois (sin, sin embargo, adoptar todos sus razonamientos) porque es manifiesto que dicha cláusula inequívocamente demuestra que la intención de la Constitución de Illinois es que la devolución del proyecto de ley podrá solamente ser hecha a la cámara cuando esté reunida. Implicaba claramente una concesión al Gobernador de tal tiempo adicional durante el cual podía hacer la devolución como pudiera transcurrir entre la expiración de los diez días expresamente concedidos y el primer día de reunión subsiguiente de la Asamblea General. La intención de la Constitución de Illinois fué claramente que una suspensión temporal de la cámara relevara al Gobernador del deber de hacer la devolución durante tal suspensión; mientras según nuestra Constitución tal intención no puede descubrirse sino que lo contrario, según entendemos, aparece claramente. Algunas razones del Tribunal de Illinois están en conflicto con los puntos de vista que nosotros tenemos y con aquéllos sostenidos por los otros tribunales que antes hemos citado. Pero es manifiesto que la conclusión a que llegó el tribunal de Illinois necesariamente tiene que descansar en el precepto peculiar de su Constitución antes establecido. El próximo caso en que descansa el apelante es el de *State* v. *South-Norwalk,* 77 Conn. 277, 58 Atl. 759. Ese caso fué decidido en 1904 y mientras interpretaba una disposición de la Constitución de Connecticut similar en sustancia a nuestra sección 18, artículo 3º. y sostenía que una mera suspensión temporal de la legislatura impediría de acuerdo con la intención de la Constitución de Connecticut la devolución de un proyecto de ley por el Gobernador con sus objeciones a la cámara en que se originó; sin embargo cuando exami-

namos la decisión parece que ella descansa en una interpretación práctica de la Constitución de Connecticut expresada por la Legislatura y los jefes ejecutivos del Estado, y de acuerdo con la cual han actuado esos dos departamentos del gobierno desde el año 1819 hasta la fecha de la decisión en el año 1904. Así resulta que tal interpretación de la Constitución de Connecticut por los dos departamentos del gobierno del Estado ha continuado por un período de 85 años, como dice la opinión, 'desde la creación del cargo ejecutivo de secretario en 1819 la práctica invariable de devolver los proyectos de ley ha sido la de entregarlos mientras la cámara está en sesión al funcionario adecuado.' De suerte que la Constitución interpretada en ese caso fué adoptada en 1818 y así la interpretación que fué sostenida por la opinión era prácticamente la interpretación que se dió a la Constitución durante todo el período de su existencia. La opinión, aunque emitida mucho tiempo después del establecimiento de una corriente unánime de autoridades contrarias a algunos de los razonamientos contenidos en ella, ignora los casos que sostenían los puntos de vista contrarios. Con la excepción de ese apoyo que dan a la posición del apelante los dos últimos casos mencionados a nosotros nos ha sido imposible encontrar ningún otro apoyo para él en ninguno de los casos que han sido resueltos y que hemos examinado. Sin embargo, en la sección 64, vol. 1, Lewis Sutherland Statutory Construction, hay un texto que aparentemente sostiene el punto de vista del apelante pero para apoyarlo el autor cita el caso de *People v. Hatch*, 33 Ill. 135, que ya hemos examinado antes.''

Después de lo que llevamos dicho, nos resta agregar que nuestra Ley Orgánica anterior contenía un precepto igual a la presente en lo relativo al deber del Gobernador de devolver a la Cámara de origen dentro de diez días los proyectos de ley que no aprobase y que en 1902 la Asamblea Legislativa de esta isla decretó en el Artículo 39 del Código Político que si el día en que deseare el Gobernador devolver un proyecto de ley sin su aprobación y con sus objeciones al mismo se hallare en receso la Cámara en que se originó, podrá entregar dicho proyecto de ley junto con su mensaje al Presidente o Secretario, y si después de buscarse con la debida diligencia no pudiere darse con ninguno de éstos, entonces hará la entrega a cualquier miembro de dicha Cáma-

ra y tal entrega tendrá el mismo efecto que si lo devolviese en sesión abierta, siempre que el primer día de reanudarse dicha sesión, el Gobernador, por medio de mensaje le notificare la entrega, con expresión de la hora en que se efectuó y la persona a quien se hizo.

Este precepto legal no trata de dar una interpretación legislativa a la ley del Congreso en cuanto a la suspensión de sesiones que impide la devolución de proyectos de ley por el Gobernador, ni limita el derecho de veto después que la Legislatura ha cerrado sus sesiones pues sus reglas se refieren únicamente a los casos en que se trata de recesos o suspensiones temporales y no a la suspensión de sesiones final o *sine die*.

Aunque esa disposición legal fué promulgada antes de estar en vigor la Ley Jones, sin embargo está en vigor porque en ese particular la actual ley es igual a la anterior y porque el Artículo 57 de la Ley Jones dispone que las leyes y ordenanzas de Puerto Rico que estaban entonces en vigor continuarían vigentes excepto en aquello en que fueren alteradas, enmendadas o modificadas por la nueva ley, por la autoridad legislativa que se provee para Puerto Rico o por el Congreso de los Estados Unidos, y como el Artículo 39 no es contrario a ninguna disposición de la nueva Ley Orgánica entendemos que es de aplicación.

Por las razones expuestas somos de opinión que debe librarse el auto perentorio de *mandamus* solicitado por el peticionario.

*Concedido el auto.*

Jueces concurrentes: Sres. Presidente Hernández y Asociado del Toro.

El Juez Asociado Sr. Hutchison firmó conforme con la sentencia.

El Juez Asociado Sr. Wolf disintió.

OPINIÓN DISIDENTE DEL JUEZ ASOCIADO SR. WOLF.

El proyecto de que se trata en el presente caso fué presentado al Gobernador en noviembre 25 de 1917. La Legislatura suspendió sus sesiones (*adjourned*) en noviembre 26 de 1917, para volverse a reunir en febrero 4 de 1918. El Gobernador no aprobó el proyecto (*bill*) ni lo devolvió con sus objeciones, y sostiene el peticionario que llegó a convertirse en ley.

Las palabras esenciales a considerar, tomadas de la Sección 34 del Acta Orgánica de Puerto Rico, son las siguientes:

"Cuando un proyecto de ley que haya sido aprobado se presente al Gobernador para su firma, si éste lo aprobare, lo firmará; si no lo aprobare, lo devolverá con sus objeciones a la cámara en donde se originó, la cual anotará dichas objeciones por extenso en su libro de actas, y procederá a reconsiderar el proyecto. * * * Si cualquier proyecto de ley no fuere devuelto por el Gobernador dentro de diez días (exceptuando los domingos) después de habérsele presentado, pasará a ser ley del mismo modo que si lo hubiera firmado, a menos que la Asamblea Legislativa, levantando sus sesiones (*by adjournment*) impidiere su devolución, siendo en ese caso ley si lo firmare el Gobernador dentro de treinta días después de recibirlo; en caso contrario no será ley."

Por tanto, cuando la defensa consiste en que determinado proyecto de ley no llegó a convertirse en ley, el problema a resolver es cuándo y cómo la suspensión de las sesiones impide la devolución; y lo primero que hay que inquirir es cuándo y cómo se hace la devolución a determinada cámara. Si el Gobernador deseare devolver un proyecto de ley, con sus objeciones, tiene que hacerlo dentro del término de diez días (exceptuando los domingos) de habérsele presentado. Si deseare tomarse el término completo de diez días para considerar el proyecto y deseare entonces devolverlo con sus objeciones, su deber es devolverlo el último día que se le ha concedido para ello. Si durante este último día la cámara correspondiente en donde se originó el proyecto no estuviese en sesión, ¿se ha impedido la devolución del proyecto? Por

lo que he leído del estatuto o de la Constitución de los Estados Unidos y por otros datos históricos que he podido encontrar, entiendo que la devolución que hubiera podido hacerse en ese último día, ha sido evidentemente impedida. En otras palabras, la devolución debe hacerse a la cámara en donde se originó el proyecto cuando la cámara esté efectivamente en sesión abierta.

Tomando las palabras "la cámara en donde se originó el proyecto", el término "cámara" (*House*) no está limitado a la casa o edificio, sino que significa, necesariamente, los miembros que componen la cámara y que se hallen en su acostumbrado sitio de reunión.

"Ninguna de las Cámaras deberá  *  *  *  suspender sus sesiones (*adjourn*) por más de tres días, ni suspenderlas para celebrarlas en otro sitio que no sea aquel en que las dos cámaras tengan su asiento." (Cita tomada de la Sección 34 que estamos considerando). La cláusula se refiere a los miembros de esa Cámara y esa condición de miembro sólo toma forma tangible y visible cuando está reunida en su salón regular de sesiones. Otra cita de la Sección 34 es la siguiente: "Ningún proyecto de ley (*bill*) pasará a ser ley hasta que sea aprobado en cada cámara en votación por lista (*Yea-and-nay vote*) por una mayoría de los miembros que la componen." La cámara está compuesta de sus miembros, y la reunión de los mismos se da por sentada. En otros pasajes y en la Sección 34 del Acta Jones, la palabra "cámara" se emplea en el mismo sentido.

La Corte Suprema de New Jersey así lo dijo en el caso *Ex. rel. Werts* v. *Rogers,* 23 L. R. A. 377, y análoga declaración se halla en "Opinions Rendered to the Governor" constante en 12 Fla. 673. Esta fué evidentemente la opinión de la Corte Suprema de Illinois en el caso de *People* v. *Hatch,* 33 Ill. 154 *et seq.* Decididamente en el mismo sentido se pronuncian los casos de *State* v. *Joseph,* 57 So. 944 y el de *State* v. *Town of South Norwalk,* 58 Atl. 760. Cada uno de estos casos sostiene que la devolución a un funcionario de la cámara es una

anormalidad en Derecho Parlamentario. Entiendo ser ésta la plena inferencia que ha de sacarse del significado original del término "cámara" derivada de cualquiera de las decisiones citadas en pro y en contra en el alegato del Fiscal General sobre la cuestión principal de si el proyecto de ley que estamos considerando pasó o no a ser ley.

"La cual cámara anotará sus objeciones por extenso en su Libro de Actas." Que no puede existir acta alguna del día no-legislativo parece tan claro que sólo se necesita citar muy pocas autoridades, pero nos referiremos a las siguientes: *Field* v. *Clark*, 143 U. S. 671; *People* v. *Hatch*, 33 Ill. 156 *et. seq.; People* v. *Leddy*, 123 Pac. 827, con sus citas de casos, y la obra de Cushing titulada "Ley y Práctica de las Asambleas Legislativas", párrafos 417, 422-423; *Montgomery Beer Bottling Works* v. *Gaston*, 51 L. R. A. 400, 411; *Rash* v. *Allen*, 76 Atl. 370, 384; *Oakland Paving Co.* v. *Hilton*, 69 Cal. 479; *State ex rel. Colbert* v. *Wheeler*, 172 Ind. 588, en donde se decide que no existe otra prueba de haberse vetado una ley fuera del Libro de Actas. El único registro provisto por la Constitución de los Estados Unidos o el Acta Orgánica de Puerto Rico es el Libro de Actas de la cámara a la que debe ser devuelto el proyecto. El acta, aunque en la práctica legislativa puede registrarse después de levantarse la sesión del día, se retrotrae al día legislativo. Cuando la Legislatura o una de las cámaras suspende sus sesiones (*adjourns*) por un día, no puede hacerse devolución alguna en ese día.

En la Opinión de los Jueces, constante en 3 Mass. 567, y en el caso de *Miller* v. *Hurford,* 9 N. W. 477, citados en la opinión de la mayoría en apoyo de su conclusión, cada una de las dichas cortes aceptó el hecho de que no podía hacerse devolución alguna en un día no-legislativo y resolvieron la cuestión decidiendo que el Gobernador tenía el prefijado número de días legislativos dentro del cual podía devolver el proyecto. En otras palabras, si bien los recesos intermedios o las suspensiones de las sesiones (*adjournments*) no impidieron la devolución, tal devolución debe hacerse en el subsi-

guiente día legislativo. La Constitución de Alabama, según se demuestra en el caso de *State* v. *Joseph, supra,* exige que se haga la devolución en la sesión subsiguiente.

Si bien la interpretación que ha de dársele al Acta Orgánica y a la Constitución de los Estados Unidos casi necesariamente significa *días del calendario* por razón de exigirse la devolución dentro de diez días (con excepción de los domingos), sin embargo, debe advertirse que de seguirse las decisiones de Massachussetts y Nebraska, el proyecto que estamos considerando dejó de convertirse en ley porque el Gobernador no tuvo diez días legislativos dentro de los cuales pudo devolver el proyecto. El mencionado proyecto se le envió en noviembre 25; la Legislatura levantó sus sesiones (*adjourned*) en noviembre 26, volvió a reunirse en febrero 4 y levantó definitivamente sus sesiones (*adjourned sine die*) en febrero 6. El Gobernador tuvo posiblemente cuatro días legislativos para devolver el proyecto.

En el caso de *Harpending* v. *Haight,* 39 Cal. 189, que es un caso cuidadosamente considerado y citado en apoyo de la conclusión a que llegó la mayoría de esta corte en su opinión, los razonamientos del mismo contenidos en la página 199 *et seq.* demuestran que la corte era de opinión que la devolución debía hacerse en sesión abierta, normalmente dentro de los diez días si fuera posible, pero de otro modo dejando el proyecto en manos de alguna persona para su efectiva devolución subsiguiente. La corte en ese caso después de demostrar que la devolución debía ser tan solemne como la presentación, declaró que no hubo devolución alguna. Fueron las especiales circunstancias de ese caso, que habremos de discutir más adelante, lo que indujeron a la corte a decir que una suspensión momentánea (*momentary adjournment*) de la cámara no impidió la devolución del proyecto.

Los razonamientos de la corte *In re* Opiniones de los Jueces, constante en 45 N. H. 610, y en el caso de *Hequembourg* v. *City* of *Dunkirk,* 2 N. Y. Supp. 447, 49 Hun. 550, son algunas de las excepciones que indican lo que constituye la

regla general.   Las mismas palabras de la sección 39 del Código Político, tomadas probablemente de California o Idaho, demuestran que, normalmente, la devolución debe hacerse en sesión abierta.   La devolución, tal como allí se especifica, dice la Legislatura, será equivalente a una "devolución en sesión abierta".   Quizás nada demuestra de la manera más claramente tradicional el modo de hacerse la devolución y la interpretación de esas precisas palabras.

El uso de la misma palabra "adjournment" necesariamente significa que el cuerpo a que se refiere ha cesado de actuar temporal o permanentemente y que no puede hacerse devolución alguna a dicho cuerpo cuando menos, hasta que se vuelva a reunir dicho cuerpo y que la Legislatura, a que se aplican esas palabras, no tiene existencia activa.

Como lo indica el Fiscal General, la palabra "adjournment", se emplea en la Sección 34 del Acta Orgánica en cuatro lugares.   Nada se halla en la ley misma que indique que los redactores de la Constitución o el Congreso entendieron más de una cosa por el uso de la palabra "adjournment". No existe autoridad alguna en el Acta Orgánica ni en la Constitución en el uso de la palabra "adjournment" para distinguirla de un receso (*recess*).   En la Sección 26 cuando el Congreso quiso referirse a una suspensión definitiva (*final adjournment*) lo dijo así con esas mismas palabras.

Si un proyecto de ley pudiera devolverse a los oficiales de una de las cámaras, entonces igualmente pudiera hacerse la devolución en cualquier tiempo, como dice Mr. Fay en su alegato en el caso de *United States* v. *Weil*, 29 Ct. of Claims 525.   El dice que aparecía muy claramente de los términos en que se halla redactada la Constitución que si el Presidente podía devolver un proyecto a un oficial de la cámara y su entrega a tal oficial constituyese una devolución suficiente, la cláusula de la Constitución relativa a la suspensión de las sesiones (*adjournment*) del Congreso que impiden su devolución sería completamente fútil; porque si pudiera devolverse a un oficial de la cámara, una suspensión de las sesiones

del Congreso nunca podría impedir su devolución. Siempre hay un oficial de la cámara, argüía él, y por lo tanto la cláusula de la Constitución carecería de significación alguna. Ulteriores y más laboriosos argumentos se hallan en los casos de *State* v. *Joseph,* 57 So. 942, y en el de *State* v. *Town of South Norwalk,* 58 Atl. 760.

Parece claro a mi entender, por lo que me dicen la razón y las autoridades, que una devolución de conformidad con la Constitución debe hacerse en sesión abierta, y de que cualquiera suspensión de las sesiones (*adjournment*) impide tal devolución cuando menos por de pronto, o hasta que la cámara de que se trata reanude sus sesiones. En el caso de *State* v. *Joseph, supra,* se declaró que no podía trasmitirse ningún proyecto de ley de una cámara a la otra cuando cualquiera de las mismas no estuviese en sesión.

Sin embargo, puesto que no existe autorización alguna para devolver un proyecto de ley después de los diez días (con excepción de los domingos), una suspensión por un término que excede del último día concedídole al Gobernador impide su devolución. Esta fué, evidentemente, la opinión del Juez *Sr. Nott* en el caso de *United States* v. *Weil, supra.*

En el tomo XX, Opiniones A. G. U. S., el Fiscal General Sr. Miller, dice:

"En otras palabras, dentro del significado de la Constitución, se ha sostenido que un receso (*recess*) ·constituye una suspensión de sesiones (*adjournment*). Como cuestión inicial yo diría que la dispersión de las dos cámaras del Congreso por un período de tiempo definitivo, de conformidad con una resolución conjunta, como la que está sometida a mi consideración, constituye una suspensión de las sesiones (*adjournment*) dentro del significado de la subdivisión 2 de la sección 7 del Artículo I de la Constitución. Si se aplicara una regla distinta a una suspensión (*adjournment*) por diez días podría aplicarse a una suspensión (*adjournment*) por muchos meses. Supóngase que el Congreso habiéndose reunido el día 1º. de diciembre levantase sus sesiones en 1º. de febrero para reanudarlas el día 1º. de octubre. ¿Qué ocurriría con un proyecto de ley presentado al Presidente y no aprobado dentro de diez días? Difícilmente podría

permanecer en un estado de suspensa animación hasta que el Congreso reanudase sus sesiones.   El Presidente no podría vetarlo en la forma prevista por la Constitución, y siendo ello así, aparecería seguirse que de no haberse firmado dejó de convertirse en ley.''

El Fiscal General ha analizado los casos de Massachusetts, New Hampshire y California y fué de opinión que la suspensión de las sesiones (*adjournment*) del Congreso impidió la devolución.   Es cierto que, para mayor seguridad, aconsejó al Presidente que aprobase o devolviese el proyecto, pero con ello no se deterioró la fuerza ni la solemnidad de su opinión. La administración de Harrison, durante la cual se emitió esa opinión, fué notable por sus cuidadosos nombramientos judiciales, y el mismo Presidente fué un abogado muy competente, de modo que la opinión de su Procurador General emitida en esa época tiene derecho a ser estimada de considerable peso.

Además de estas dos expresiones de la actitud federal hacia esta especial disposición de la Constitución, tenemos el hecho, como lo indica el Fiscal General, de que en el caso de *La Abra Silver Mining Company* v. *United States,* 175 U. S. 423, los funcionarios del gobierno sostenían que el proyecto en controversia en aquel caso había pasado a ser ley, y sin embargo en ninguna parte de su argumento se fundaron en la teoría de que el proyecto se había convertido en ley por la razón de que el Presidente no lo había devuelto dentro de los diez días.   Ellos se basaron enteramente en el hecho de que había sido aprobado después de transcurridos los diez días.

Análogo razonamiento respecto a la interpretación del Ejecutivo se halla en el caso de *People* v. *Kaiser,* 135 N. Y. Supp. 274 (confirmado en 206 N. Y. 46.)

En el caso de La Abra Silver Mining Co., *supra,* el Júez Sr. Harlan dice que la aprobación de un proyecto de ley y la devolución del mismo los coloca la Constitución sobre bases diferentes y todo lo que ese caso específicamente resolvió fué que un proyecto de ley podía ser aprobado durante un receso (*recess*).

En el caso de *State* v. *Town of South Norwalk,* 58 Atl.

759, el Juez Sr. Baldwin fué de opinión que se había impedido la devolución.   La opinión de la mayoría considera tal decisión muy sumariamente, pero creemos que merece una consideración más extensa.   Da una idea de las primeras relaciones entre la Legislatura y el Gobernador, demostrando que, por lo menos en aquel Estado, el Gobernador formaba parte de la Legislatura, presidiendo sus sesiones.   Esto me lleva a considerar otro punto, o sea, que nada existe en las palabras de la Constitución o de la Ley Orgánica que exija que el Gobernador presente sus objeciones por escrito.   El pudiera comparecer ante la cámara el último día de sesiones y manifestar sus objeciones oralmente, y la cámara correspondiente estaría obligada a extender sus objeciones en su diario de sesiones.   Este procedimiento, como lo indica el caso de Connecticut, probablemente no hubiera sorprendido a ninguno de los primeros legisladores, y la acción del Presidente Wilson al comparecer personalmente ante el Congreso para hacer sus mensajes da color a la teoría de que el Gobernador podría de tal modo presentar sus objeciones oralmente.

·El caso *In re* An Act entitled "An Act Concerning Public Utilities" 84 Atl. 706, es de exacta aplicación, y sus razonamientos y las autoridades que cita justifican la actitud del demandado en este caso.   *People* v. *Hatch,* 33 Ill. 156, es un caso aplicable en cuanto a sus razonamientos generales, aunque en ese estado el Gobernador debe, según la Constitución, devolver el proyecto en la próxima sesión legislativa.

He tratado de demostrar que en Massachusetts y Nebraska, encontrándose en situación algo similar, se resolvió la cuestión diciendo que los días concedidos al Gobernador para deliberar eran días legislativos y no días naturales.   En el caso de New Hampshire la suspensión, aparentemente, fué sólo hasta después del domingo, pero en todo caso la corte resolvió que la suspensión ordinaria de un día para otro, declarándose en recesos no impedía la devolución.   El caso de Nueva York, de *Hequembourg* v. *City of Dunkirk,* 2 N. Y. Supp.

447, 49 Hun. 550, siguió la teoría del de New Hampshire, diciendo que un receso ordinario no impedía la devolución.

En el caso de *Harpending* v. *Haight,* supra, de California, fué sólo una de las cámaras la que suspendió su sesión. La corte resolvió que no hubo devolución; y la razón *decidendi* fué que como la ley no exigía imposibles el Gobernador estaba obligado a hacer la devolución como mejor pudiera. Si en ese caso hubiera devuelto el proyecto en la siguiente sesión pública de la cámara, estando la Legislatura en sesión contínua, la corte probablemente hubiera sostenido que esa devolución era suficiente.

El caso de *State ex rel. State Pharmaceutical Association* v. *Michel,* 49 L. R. A. 218, de Louisiana, aunque en la página 225 dice que la suspensión, tal como aquí se usa, significa suspensión final, no estaba planteada en él la cuestión de un receso temporal ni tampoco la de una suspensión final, y hasta cierto punto no puedo comprender por qué la corte tuviera que considerar ese punto. Lo que la corte realmente resolvió fué que el proyecto había muerto porque el Gobernador lo había devuelto en tiempo, puesto que el término que tenía de cinco días naturales o calendarios (exceptuando domingos) no había expirado, y entonces la corte cuidadosamente explica cómo debe hacerse ese cómputo. Resuelve también, sin embargo, que es suficiente devolución el entregar el proyecto a algún oficial, como sucedió en los casos de New Hampshire y de New York ya citados. Porque algunos de de estos casos parecen indicar que la devolución hecha a un oficial es suficiente, es que he tratado especialmente de demostrar que las palabras "la cámara" no son susceptibles de tal interpretación.

El caso de *Johnson City* v. *Tennessee East. Elec. Co.,* 182 S. W. 587, es el que más se acerca a sostener las contenciones del peticionario. Pero así como la corte en ese caso trata de distinguir los casos de Illinois y de Connecticut haciendo referencia a sus constituciones y prácticas especiales, creo yo que el caso de Tennessee puede ser distinguido. En reali-

dad de verdad la corte decidió que la interpretación que ha de darse al precepto constitucional específico está determinada por la propia Constitución de Tennessee, puesto que la disposición estatutoria permitiendo la devolución por parte del Gobernador, con sus objeciones escritas, a la comisión de proyectos registrados sería una devolución válida dentro del significado de la Constitución.

En vista del lenguaje mismo de la Constitución Federal y de las autoridades que he citado, incluyendo el caso de New Jersey que en el de Tennessee no se cita, éste no puede tenerse por decisivo. Quedan ya considerados los casos discutidos en la opinión de la mayoría.

La conclusión general a que he llegado queda robustecida por el hecho de que el Gobernador, al vetar un proyecto, casi universalmente está considerado como que actúa como parte de la Legislatura. Véase la nota del caso de *Detroit* v. *Chapin,* 37 L. R. A. 396; Sutherland Stat. Const., sec. 60, p. 101; *Com. ex rel. Elkin* v. *Barnett,* 199 Pa. 166, 55 L. R. A. 882; *Lukens* v. *Nye,* 105 Pac. 594; *Regents of State University* v. *Trapp,* 113 Pac. 912; *State ex rel. Main* v. *Crouns* (Neb.), 20 L. R. A. 265; *In re* Executive Communication (Fla.), 6 So. 925; *Fulmore* v. *Lane* (Tex.), 140 S. W. 411. No puede realizarse acto alguno legislativo mientras la Legislatura no está en sesión.

El Congreso ha dicho específicamente con respecto a Puerto Rico que el Gobernador tendrá treinta días para aprobar un proyecto de ley en caso de que la suspensión impida la devolución, pero la devolución deberá hacerse exactamente como lo sería de acuerdo con la Constitución de los Estados Unidos. En el caso de *Lyons* v. *Woods,* 153 U. S. 663, la corte resolvió que la Constitución de un Territorio, en tanto en cuanto es conforme a la Constitución de los Estados Unidos, ha de interpretarse al igual que lo sería la Constitución de los Estados Unidos.

Ahora bien, exceptuando quizás el caso de Tennessee, la consecuencia final de las opiniones citadas, en cuanto son

razonadas y no simples *dicta,* es que las cortes no se aco-
gerán a una interpretación liberal de la ley cuando una suspen-
sión temporal, momentánea u ordinario receso impide la devo-
lución de un proyecto.   El Gobernador en ese caso, como dice
el de California, debe devolver el proyecto como mejor pueda.
Pero me parece que estas cortes han hecho una excepción al
lenguaje de la Constitución con el fin de dar efecto a lo que
ellas consideraron la evidente intención de los redactores de
la Constitución.   Es posible, también, que yo no disintiera de
tal interpretación dada a una suspensión por algunos días
o a una suspensión ordinaria de la Legislatura.   Debe darse
efecto a cada parte de una Constitución.   No hay, sin em-
bargo, razón alguna para extender la excepción de tal modo
que se convierta en regla general.   No trato ahora de definir
claramente qué constituiría un receso ordinario que no impi-
diera la devolución.   Una suspensión por setenta días, como
ha sucedido en el presente caso, no participa de la natura-
leza de un receso ordinario.

La corte debe tratar de dar efecto a todas las disposicio-
nes de la Constitución.   Aún la interpretación literal de que
la suspensión por un solo día impediría la devolución no mata
necesariamente un proyecto.   Sólo asegura la consideración
del mismo por el Ejecutivo durante treinta días, cuyo privi-
legio o deber quedaría de lo contrario anulado, especialmente
cuando, como en el presente caso, la mayor parte del trabajo
de la sesión estaba en poder del Gobernador para su consi-
deración.   La opinión de la mayoría demuestra que el Go-
bernador devolvió veinte y ocho proyectos de ley, con sus ob-
jeciones, después de la suspensión de noviembre 26.   Las
Leyes de la Sesión demuestran que sesenta y tres proyectos
y algunas resoluciones fueron aprobadas más tarde, y el ré-
cord muestra que no se tomó acción alguna sobre once de los
proyectos, entre los cuales está el que tenemos ante nosotros.
En otras palabras, que después de la suspensión de la Legis-
latura en noviembre 26 el Gobernador tenía en su poder más
de cien proyectos y resoluciones para considerar.   El período

de la suspensión era posterior a la expiración del primitivo
término de noventa días de la sesión, y había pasado mucho
tiempo desde el día en que no podían presentarse nuevos pro-
yectos.

La Ley Orgánica demuestra claramente la intención del
Congreso de que el Gobernador tenga treinta días para la
consideración de los proyectos al cerrarse la sesión, y debió
haberse dado efecto a esa intención del Congreso a menos
que en contrario no apareciera una razón muy poderosa. Al
escoger entre dos males, me parece mejor que algunos pro-
yectos fracasen por falta de tiempo para deliberar, y no que
todos los proyectos sean considerados apresuradamente. En
virtud de la Constitución de los Estados Unidos y de la ma-
yor parte de los Estados individualmente, el Ejecutivo tiene
una voz en la Legislatura igual a dos terceras partes de los
miembros de cada cámara, exceptuando un miembro de cada
una. Si las cortes se inclinan a una interpretación literal para
dar efecto al derecho de una cámara determinada a suspender
su sesión por un día o a suspender la Legislatura ambas por
un corto receso, las cortes deben también ser perspicaces para
impedir que quede anulado el privilegio que tiene el Ejecutivo
para deliberar. Una de las ideas principales de la Sección 34
es que la sesión debe ser continua. Me parece que, a excep-
ción de la de Tennessee, casi cualquiera de las cortes enume-
radas en el alegato del Attorney General, donde se conside-
raban los casos en pro y en contra, hubiera dicho que la sus-
pensión tomada en este caso era más bien una suspensión final
por su naturaleza que un receso ordinario. Las consecuencias
desagradables de cualquiera otra interpretación son mani-
fiestas. Se dice, por ejemplo, en la obra "Watson On The
Constitución," volumen 2, p. 991, que el receso del Senado no
significa la suspensión de la sesión por un día de fiesta; y
que el Presidente no está justificado para hacer un nombra-
miento de receso durante ese período. Por tanto si esta sus-
pensión ha de ser considerada como un receso ordinario, y
si el comentarista está en lo cierto, el Gobernador estaba im-

pedido de hacer nombramiento alguno por un período de setenta días, desde noviembre 26 hasta febrero 4. Como si la Legislatura puede suspender su sesión por setenta días, puede hacerlo así por un período mucho más largo que se extienda quizás hasta cerca de un año, tal suspensión paralizaría, durante esa prolongada suspensión, la facultad que tiene el Gobernador para hacer nombramientos. Y, asimismo, impediría probablemente la posibilidad de una sesión extraordinaria. Si la suspensión en este caso, aunque no una suspensión final, participa del carácter de una suspensión final, no haciendo la Ley Orgánica distinción entre suspensión y receso, parece entonces probable que, durante una larga suspensión por setenta días o más, el Gobernador podría tanto hacer nombramientos como convocar a una sesión extraordinaria de la Legislatura.

Se ha advertido en la opinión de la mayoría el hecho de que el Gobernador devolvió veinte y ocho proyectos de ley con su veto. La inferencia sería que ésta era una interpretación por parte del Ejecutivo, pero si hay tal interpretación en este caso, ella consiste en el acto del Secretario Ejecutivo al negarse a promulgar la ley en cuestión. Él está enteramente sujeto a las órdenes del Gobernador. Asimismo, el Attorney General, como parte de la rama Ejecutiva del Gobierno aparece aquí combatiendo la expedición del auto de *mandamus*. La acción del Gobernador en este caso, como en el de la opinión dada por el Attorney General Miller al Presidente Harrison, es la acción que se tomaría fácilmente debido a exceso de precaución. El Gobernador pudo haber firmemente creído, como lo creyó el Attorney General Miller, que los proyectos no devueltos durante los setenta días no se convertirían en ley; pero también podía, sin embargo, escoger las leyes que según él estaban sujetas a mayor número de objeciones y devolverlas vetadas a la Legislatura en la forma indicada por el artículo 39 del Código Político. El pudo haber abrigado dudas respecto de la interpretación que hubieran de darle las cortes, y tal duda ha quedado hasta

ahora justificada por la actuación de esta Corte en el presente caso. En todo caso sería plausible por parte del Gobernador el expresar sus objeciones, en bien de la futura legislación. Ninguna serie de actos solamente que abarque un período corto de tiempo debe ser considerado como una interpretación del Ejecutivo.

La opinión de la mayoría también hace hincapié en los efectos del artículo 39 del Código Político, que dice así:

"'Si el día en que deseare el Gobernador devolver un proyecto de ley sin su aprobación y con sus objeciones al mismo, se hallare en receso (por el día, pero no por la sesión) la cámara en que se originó, podrá entregar dicho proyecto de ley junto con su mensaje al Presidente o Secretario, y si después de buscarse con la debida diligencia, no pudiere darse con ninguno de éstos entonces hará la entrega a cualquier otro miembro de dicha cámara y tal entrega tendrá el mismo efecto que si se devolviese en sesión abierta siempre que el primer día de reanudarse dicha sesión, el Gobernador, por medio de un mensaje, le notifique la entrega, con expresión de la hora en que se efectuó y la persona a quien se hizo."

La contestación principal a esa contención es que el artículo 39 es absolutamente ineficaz para cambiar la interpretación que ha de darse a las palabras del Acta Orgánica respecto a qué constituye o qué impide una devolución. Si la devolución estuviera impedida por la suspensión de la Legislatura, en virtud de la Constitución, la Legislatura no podría hacer posible una devolución en otra forma, como se indicó en *People* v. *Hatch,* 33 Ill. 154 et seq., y en *State* v. *Joseph,* 57 So. 944. Hay tres cosas, de acuerdo con el Acta Orgánica, que el Gobernador puede hacer después que se le presenta un proyecto de ley: puede aprobarlo, puede devolverlo con sus objeciones, o puede no tomar acción alguna. El artículo 39, por sus términos, se refiere sólo al caso en que el Gobernador desea devolver un proyecto con sus objeciones; no tiene aplicación al caso en que opta por no tomar acción alguna por falta de tiempo, o por alguna otra causa. La Ley Orgánica claramente dispone que si después de ex-

pirar los treinta días no lo aprobare, el proyecto no se convierte en ley, demostrando así que el Congreso persistía en decir que un proyecto quedaría derrotado si el Gobernador no lo aprobaba. El artículo 39, además, fué adoptado con anterioridad a la Ley Orgánica. La anterior Ley Orgánica no contenía precepto alguno con respecto a ese privilegio de treinta días. Es evidente, además, de una lectura del artículo 39, que se refiere a una suspensión de la cámara por el día y no a una suspensión de la Legislatura por un largo período.

Como después de ser presentados al Gobernador los proyectos deben ser devueltos en una sesión pública de la cámara correspondiente y como no había tal cámara en sesión al expirar los diez días (exceptuando domingos) ni dentro del término de un receso ordinario, yo sostengo que la devolución del proyecto de que se trata fué impedida y que la expedición del *mandamus* debió haberse denegado.